Zobel, J.
Defendant, asserting an exclusion, denies coverage under an insurance policy (“the Policy”). Plaintiff also makes claims for violations of G.L.c. 176D and G.L.c. 93A.
The following material facts are undisputed:
At the time this dispute, Plaintiff was a tenant in a warehouse at 21 Blandin Avenue in Framingham, pursuing the business of processing second-hand clothing for resale to charity organizations throughout the United States and overseas. The clothing was baled into half-ton bales, which were then stacked in the warehouse, the bottom bales resting on the concrete floor.
On January 19, 1999, one of Plaintiffs employees discovered water on the concrete floor in the area where the clothing bales were stored. Some of this water soaked into the lowest bales, damaging the contents. The bales higher up in.the stack remained dry and undamaged.
Plaintiff having notified Defendant of the situation, on January 23, 1999, Defendant’s representative, George Butler Adjusters, Inc., acting through Paul Battaglino (“Battaglino”), inspected the property accompanied by Plaintiffs public adjuster, Robert W. Rossini (“Rossini”). The inspection confirmed water damage only to the bales on the bottom of the stacks, and ruled out the possibility that rupture of the sprinkler system had caused the loss.
On February 8, 1999, Battaglino, Rossini, and Richard Mancuso (“Mancuso”), a licensed contractor with R.M. Mancuso & Associates, Inc., conducted an additional examination. The roof and upper walls of the warehouse showed no signs of water penetration or leakage. However, the lower portions of the warehouse’s concrete walls and a rotted portion of the side doorway presented revealed signs of water entry.
Upon inspecting the exterior of the building, Mancuso discovered roof drains which emptied onto the pavement outside the area of penetration. Additionally, he observed piles of snow which had been plowed up against the exterior walls and around the rotted doorway where the seepage had occurred. Mancuso concluded that the water penetration had resulted from the thawing of snow built up outside of the warehouse which had caused water to puddle at the rotted door.
On February 11, 1999, Plaintiff submitted a claim (with supporting documentation) to Defendant for $75,045.
The Policy provided, in pertinent extract:
B. EXCLUSIONS
1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
g. Water
(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
(2) Mudslide or mud flow;
(3) Water that backs up from a sewer or drain; or
*630 (4) Water under the ground surface pressing on, or flowing or seeping through:
(a) Foundations, walls, floors or paved surfaces;
(b) Basements, whether paved or not; or
(c) Doors, windows or other openings.
But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that resulting loss or damage.
C. LIMITATIONS
1. We will not pay for loss of or damage to:
c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:
(1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or
(2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.
On the basis of the policy language, Defendant denied coverage because it concluded that the water damage had resulted from surface water which penetrated the lower portion of the wall and the side door. Other than the snow plowed against the building, the premises showed no evidence of any trench or man-made channel.
The first question, therefore, is whether the water which entered the warehouse was “surface water,” within the meaning of the Policy. If so, then we must determine whether snow which a plow has pushed against the exterior of a structure constitutes a man-made trench.
Although the Policy itself does not define surface water, the Supreme Judicial Court has described surface waters as “waters from rain, melting snow, springs, or seepage, or floods that lie or flow on the surface of the earth and naturally spread over the ground but do not form a part of a natural watercourse or lake.” DeSanctis v. Lynn Water & Sewer Commission, 423 Mass. 112, 115 n.6 (1996).
“The term ‘surface water’ is used to describe water that occasionally accumulates from natural sources and that has not yet evaporated, percolated into the earth or found its way into a stream or lake.” Restatement (Second), Torts §846, comment b (1979). Surface water thus lacks a defined course or channel and permanent existence.
Given the absence of evidence that the water had leaked into the warehouse through the roof, it could only have resulted from (a) the thawing snow in the doorway; or (b) water that had flowed from the roof down the drainage pipes and onto the pavement; or (c) both. Thus, the water was surface water.
Plaintiff relies on Transamerica Insurance Co. v. Raffkind, 521 S.W.2d 935 (Tex.Civ.App. 1975), to support its contention that the water lost its character as surface water. There, however, surface water first entered the soil beneath a building before seeping into underground non-watertight ducts and evaporating into the house. Id. at 937. The water “had lost its status as surface water by being absorbed into the ground.” Id. at 939 (emphasis supplied). Here, the thawing snow and roof water entered the warehouse directly through the lower portion of the concrete foundation and the hole in the rotted door. The water, never entering the soil or ground, remained surface water.
Water may, however, lose its status as surface water if it is directed into a man-made trench, thus preventing natural drainage. The question then is whether the “trenches” created by plowing the snow against the building’s exterior qualify as “man-made trenches.” For present purposes, it may be taken as true that these ruts prevented the natural flow of the thawed snow and channeled it into the building.
Snow however plowed is not a “trench.” Although the snow was pushed against the exterior of the building, the record is bare of evidence that the plowing operation intended to create any kind of trench or channel.
Because the water entering Plaintiffs warehouse was surface water, which retained its status even though it may have reached the premises through ruts in the plowed snow, Defendant properly denied coverage under the Policy.
Plaintiffs final claims concern violations of G.L.c. 176D and G.L.c. 93A. The gravamen of these claims is that Defendant’s denial of policy coverage amounted to an unfair claims practice. Under most circumstances, an insurer denying coverage does not commit a statutory violations if the denial rests on a plausible interpretation of the policy. See, Gulezian v. Lincoln Insurance Co., 399 Mass. 606, 613 (1987). Moreover, “[a]s a general rule, an insurance company does not act unfairly or deceptively . . . with respect to a claim made under a policy of insurance simply by making a legally correct disclaimer of coverage.” Employers Insurance of Wausau v. George, 41 Mass.App.Ct. 719, 729 (1996); Jet Line Services, Inc. v. American Employers Insurance Co., 404 Mass. 706, 717 (1989).
In the present case, Defendant correct denial of coverage does not subject it to the lash of either statute.

ORDER

Accordingly, it is Ordered, that Defendant’s Motion for Summary Judgment be, and the same hereby is, Allowed; and it is
Further Ordered, that Plaintiffs Cross Motion for Summary Judgment be, and the same hereby is, Denied; and it is
Further Ordered, that Judgment enter forthwith as follows:
Complaint Dismissed, with prejudice.